IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JOHN P. IRVINE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DESTINATION WILD DUNES MANAGEMENT, INC.; DESTINATION HOTELS & RESORTS, INC.; AND LOWE HOSPITALITY GROUP, INC.,<br><br>Defendants. | Civil Action<br>No. 2:15-cv-00980-RMG<br><br>**COMPLAINT**<br>**(FLSA Collective Action; Age Discrimination under the ADEA; and Constructive Discharge)**<br><br>**Jury Trial Requested** |

Plaintiff John P. Irvine ("Irvine"), on his behalf and on behalf of employees similarly situated, files this Complaint against Defendants Destination Wild Dunes Management, Inc. ("Wild Dunes"); Destination Hotels & Resorts, Inc. ("DH&R"); and Lowe Hospitality Group, Inc. ("LHG") [collectively "Defendants"] and alleges as follows:

**PARTIES**

1. Plaintiff is a resident of Charleston County, South Carolina, and brings this action on behalf of himself and all other similarly situated employees and former employees of Defendants for minimum wages as well as other relief allowed under the Fair Labor Standards Act, as amended, 29 U.S.C. § 201, et. seq. ("FLSA").

2. Upon information and belief, Destination Wild Dunes Management, Inc. is a South Carolina corporation maintaining offices and agents and otherwise doing business in the County of Charleston, State of South Carolina.

3. Upon information and belief, Destination Hotels & Resorts, Inc. is a California corporation maintaining offices and agents and otherwise doing business in the County of Charleston, State of South Carolina directly and through its subsidiaries, including Destination Wild Dunes Management, Inc.

4. Upon information and belief, Lowe Hospitality Group, Inc. is a California corporation maintaining offices and agents and otherwise doing business in the State of South Carolina directly and through its subsidiaries, including Destination Hotels & Resorts, Inc. and Destination Wild Dunes Management, Inc.

5. Upon information and belief, LHG owns 100% of the stock in DH&R.

6. Upon information and belief, DH&R owns 100% of the stock in Wild Dunes.

**JURISDICTION & VENUE**

7. This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 based upon Plaintiff's claims under the FLSA and, as to Plaintiff's individual claim, the Age Discrimination in Employment Act ("ADEA").

8. Venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the Plaintiff's claims occurred here and Defendants each regularly conduct business in and have continued to engage in the wrongful conduct alleged herein within this District.

**CONDITIONS PRECEDENT AS TO PLAINTIFF IRVINE**

9. With respect to Plaintiff Irvine's ADEA claim, he has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below. Moreover, Defendants employed twenty (20) or more employees at all

pertinent times as required by the ADEA; thus, Defendants are employers as defined by the ADEA and are otherwise subject to and covered by said Act.

10. On or about June 17, 2013, and as a result of Defendants' discriminatory conduct, all of which is more fully described below, Plaintiff Irvine filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon age.

11. On December 3, 2014, the EEOC issued Irvine a Notice of Suit Rights letter, which is attached hereto as **Exhibit A** and incorporated as if set forth verbatim herein.

12. Irvine has timely filed this action within 90 days of his Notice of Suit Rights letter from the EEOC.

## FACTS COMMON TO ALL PLAINTIFFS

13. Plaintiff realleges each and every allegation contained above as if repeated here verbatim.

14. Wild Dunes is a resort located in Charleston County owned by Destination Hotels & Resorts, Inc. and operates various restaurants within the resort including, but not limited to, Sea Island Grill, The Lettered Olive, Hudson's Market, The Sand Bar – A Southern Kitchen, Dunes Deli, and Grand Pavilion Café and Bar, all under the moniker of Destination Wild Dunes Management, Inc.

15. Destination Hotels and Resorts, Inc. is a privately held lodging management company headquartered in Colorado with over thirty (30) independent, luxury and upscale hotels, resorts and golf clubs, including Wild Dunes. It is the fifth largest independent hospitality management company in the United States.

16. Destination Hotels and Resorts, Inc. is a subsidiary of Lowe Hospitality Group ("LHG"), which is owned by Lowe Enterprises, a privately held national real estate investment, management, and development firm headquartered in Los Angeles.

17. Destination Hotels and Resorts, Inc. employs more than 9,000 employees nationwide and has more than 2.7 billion dollars in assets under its management, including Wild Dunes.

18. Defendants hired Plaintiff as a server May 4, 2004, to work in the Sea Island Grill.

19. Defendants paid Plaintiff, and all other similarly situated employees, less than the statutory minimum wage by taking the "tip credit" under the FLSA, 29 U.S.C. § 203(m). Those provisions permit employers of tipped employees to pay wages less than the minimum wage, so long as employers comply with other requirements of the "tip credit" provisions.

20. Irvine and other servers similarly situated to him were paid Three and 25/100 ($3.25) per hour, plus tips that they received, less deductions taken by Defendants.

21. Irvine and other servers similarly situated to him were required to perform non-tipped work, such as maintenance and preparatory work, in excess of twenty percent (20%) of their time at work. Defendants violated the FLSA by requiring tipped employees to perform non-tipped duties for periods in excess of twenty percent (20%) of their time at work, and therefore violated the FLSA, 29 U.S.C. § 203(m).

22. Irvine and other servers similarly situated to him were also required to perform non-tipped work that was unrelated to their tip-producing work. Defendants violated the FLSA by requiring tipped employees to perform these non-tipped and unrelated duties and by not paying those employees minimum wage for performing such duties.

23. Irvine alleges on behalf of himself and others similarly situated that their unpaid wage claims include unpaid wages due to Defendants' imposition of a tip credit (which reduced the hourly wages paid to Plaintiff and others similarly situated) when Defendants were not entitled to impose such a tip credit.

24. Examples of non-tipped work which Plaintiff and others similarly situated were required to perform at the reduced tip credit rate include, but are not limited to, (i) polish and organize flatware and plateware; (ii) bus and clean tables; (iii) make unsweetened and sweetened tea before and throughout the shift; (iv) stock and organize walk-in coolers and stock areas; (v) clean and stock walk-in coolers and stock areas; (vi) clean the restaurant and patio area; (vii) set-up and break-down for private parties and banquets; (viii) clean-up after private parties and banquets; and (ix) clean and dust chandeliers and windows.

25. The side work which Plaintiff and others similarly situated were required to perform exceeded twenty percent (20%) of their time at work.

26. In addition to their tipped work, Plaintiffs and all other similarly situated employees were required by the Defendants to perform work that was unrelated and not incidental to the duties of their tipped occupation.

27. Additionally, Plaintiff and others similarly situated were required to conduct non-tipped work for approximately one or more hours before each shift and one or more hours after each shift at a rate of pay that was less than the statutory minimum wage.

28. As a result, Plaintiff and others similarly situated were entitled to at least the applicable minimum wage for all such time worked, without applying a tip credit.

29. Although at this stage Plaintiff and others similarly situated are unable to state the exact amount owed to them, Plaintiff believes that such information will become available during the course of discovery. However, when an employer fails to keep complete and accurate time records, employees may establish the hours worked solely by their testimony and the burden of overcoming such testimony shifts to the employer.

## SPECIFIC FACTS AS TO PLAINTIFF IRVINE

30. Plaintiff realleges each and every allegation contained above as if repeated here verbatim.

31. Plaintiff Irvine is currently sixty-two (62) years old and, at all pertinent times as set forth herein, was over forty (40) years of age.

32. Irvine was hired by Defendants on or about May 4, 2004 as a Server at the Sea Island Grill by Jon Ziegler ("Ziegler"), the General Manager of the Sea Island Grill at the time.

33. On or about September 3, 2004 and after completing his initial trial period in the position, Irvine received an excellent performance evaluation by Ziegler, which stated that Irvine gave a "high priority to the guests."

34. Moreover, while working under Ziegler, Irvine always received overall scores of "above average" on all of his annual performance evaluations and Ziegler always told Irvine that he was doing a great job.

35. Additionally, while working under Zielger, Irvine was given many sales awards and won many sales contests.

36. Defendants employ a young workforce. In fact, Irvine was the oldest employee on the property.

37. In or around November, 2012, Chris Harvey ("Harvey") was hired as General Manager of the Sea Island Grill. Accordingly, Harvey became Irvine's supervisor at that time. Harvey is, and at all pertinent times was, in his early to mid-thirties.

38. As soon as Harvey took over as Manager, he proclaimed that he was "going to change things in the restaurant" and that "everyone would be marching to a different tune." Harvey also made it known to the staff that he wanted a younger workforce and would replace all of the old employees.

6

39. Up until this point in his employment, Irvine never had a problem with any of his supervisors. However, almost immediately upon his hire and upon becoming Irvine's supervisor, Harvey began to treat Irvine in a negative and antagonistic manner.

40. On or about December 9, 2012, Harvey met with Irvine and told Irvine that all of the staff and all of the customers loved being waited on by him at the restaurant. However, Harvey proceeded to give Irvine a verbal warning for purported "slow service."

41. Harvey then told Irvine that there would be a follow up meeting by no later than January 9, 2013. However, this meeting never occurred.

42. On or about March 13, 2013, Harvey issued Irvine a written warning for not informing a guest that a menu item was not available. Irvine explained to Harvey that the kitchen staff had not communicated this information to the servers and, therefore, many of the servers working the shift made the same error and did not inform the guests of the unavailability of the menu item.

43. It is, and at all relevant times was, the job responsibility and function of the kitchen staff to inform servers by no later than 5:00 P.M. of any substitutes to the menu and Harvey said he would address this problem with the kitchen staff. However, none of the other servers who were working on that night nor any of the kitchen staff were given a written warning or otherwise disciplined in any manner.

44. Irvine was scheduled for a performance evaluation on or around April 2013, but it was never given to him although other servers that Harvey supervised were given evaluations during this time.

45. On or about March 29, 2013, the kitchen was operating extremely busy and slow and had a backlog of food orders to get out. A guest that evening in the Sea Island Grill wrote a letter to the company complaining about the speed of the service she received that particular evening. As

7

a result of the guest's letter, Harvey issued Irvine a warning on April 23, 2013, nearly a month later. Despite the fact that the slow kitchen service was attributable only to the kitchen staff's performance, Irvine was the only individual who was singled out and issued a warning for the guest's complaint.

46. On or about April 29, 2013, Irvine was given another warning by Harvey for allegedly leaving the premises without notifying a supervisor. This, however, was not true.

47. In fact, the Assistant Manager, Casey March, specifically granted Irvine permission to leave late in the evening after his work was complete. This alleged "warning" was never signed by a manager and March agreed to remove it from Irvine's personnel file as it was not true. However, it was not removed from Irvine's personnel file.

48. On or about June 5, 2013, Harvey completed a graph of all of the servers and the amounts of money that they brought into the organization. Irvine was at the top of the list so all of the staff toasted him that day and applauded him for high sales number.

49. On or about June 6, 2013, as Irvine drove into the parking area to begin his shift, he was confronted by Harvey who was waiting for him. Harvey immediately notified Irvine that the two of them were going to see Keith Schnulle, Director of Human Resources, which they proceeded to do.

50. Once they arrived at Schnulle's office, Harvey handed Irvine a final written warning for allegedly placing incorrect seat numbers on tables on or about May 28 and 29, 2013. The warning indicated that Irvine was being suspended. He was not suspended.

51. In fact, Schnulle demanded Irvine either resign or the company was going to terminate him and cause harm to his employment record. Schnulle handed Irvine a blank piece of paper

and demanded that he write that he was resigning on the paper. Being given no choice, Irvine complied with Schnulle's demand.

52. Despite Irvine's alleged performance deficiencies, Schnulle did offer Irvine two (2) seasonal positions in the various pool areas, but Irvine did not accept as he needed full-time work.

53. After Irvine was fired and/or forced to resign, Harvey hired a younger female, Angie Villegas, to replace Irvine. Villegas is twenty-six (26) years old and, thus, is significantly younger than Irvine.

54. Based on the foregoing, Irvine was discriminated against, disciplined, and terminated due to his age.

**FIRST CAUSE OF ACTION BY IRVINE AND OTHERS SIMILARLY SITUATED AS TO ALL DEFENDANTS**
**(Violation of Fair Labor Standards Act 29 U.S.C. § 203(m), 206**
**(Violation of Tip Credit/Failure to Pay Proper Minimum Wage))**

55. Plaintiff incorporates all allegations above into this cause of action.

56. As set forth above, Irvine, and all other similarly situated employees, were employed by Defendants.

57. At all times pertinent hereto, Defendants engaged in interstate commerce or in the production of goods for commerce as defined by 29 U.S.C. § 203(r) and 203(s).

58. At all times pertinent hereto, Defendants' annual gross volume of sales made or business done was not less than Five Hundred Thousand and 0/100 ($500,000.00) Dollars. Alternatively, Plaintiff, and all other similarly situated employees, worked in interstate commerce so as to fall within the protection of the FLSA.

59. The business of Defendants was and is an enterprise engaged in commerce as defined by 29 U.S.C. § 203(s)(1) and, as such, Defendants are subject to, and covered by, the FLSA.

60. The FLSA, 29 U.S.C. § 206, requires employers to pay its nonexempt employees a minimum wage of Seven and 25/100 ($7.25) Dollars an hour.

61. The FLSA, 29 U.S.C. § 203(m), provides an exception allowing employers to pay less than the statutory minimum wage to tipped employees on account of the tips they earn, on the condition that the tip credit is not claimed against the minimum wage for time spent by employees working in a non-tipped occupation or conducting non-tipped work.

62. Pursuant to 29 C.F.R. § 531.56(e), while the FLSA permits employers to pay tipped employees less than the minimum wage on account of the tips they ear, employers cannot claim a tip credit against the minimum wage for time spent working in a non-tipped occupation.

63. According to the regulations promulgated by the Department of Labor, employers may not claim the tip credit for employees who spend "a substantial amount of time (in excess of 20 percent) performing" non-tipped work. DOL Field Operations Handbook ("DOL Handbook") § 30d00(e).

64. When the employer claims the tip credit as to employees who spend more than twenty percent (20%) of their work time performing non-tip producing work, the tip credit is invalidated.

65. When the tip credit is invalidated, the employer can no longer enjoy the benefits of the tip credit provision, 20 U.S.C. § 203(m).

66. Without the benefit of the tip credit provision, Defendants must pay each nonexempt employee the statutory minimum wage of Seven and 25/100 ($7.25) Dollars per hour.

67. Rather than pay its tipped employees the statutory minimum wage of Seven and 25/100 ($7.25) Dollars per hour, Defendants imposed a tip credit upon Plaintiff and all other similarly

situated employees. Defendants therefore paid Plaintiff and all other similarly situated employees at a rate less than the statutory minimum wage.

68. As a result of Defendants' imposition of the tip credit, Plaintiff and all other similarly situated employees were forced to perform minimum wage work at an hourly rate that was less than the statutory minimum wage.

69. In addition to their tipped work, Plaintiffs and all other similarly situated employees were required by Defendants to perform non-tipped work for which they were paid at the reduced tip credit rate. Examples of non-tipped work which Plaintiff and others similarly situated were required to perform at the reduced tip credit rate include, but are not limited to, (i) polish and organize flatware and plateware; (ii) bus and clean tables; (iii) make unsweetened and sweetened tea before and throughout the shift; (iv) stock and organize walk-in coolers and stock areas; (v) clean and stock walk-in coolers and stock areas; (vi) clean the restaurant and patio area; (vii) set-up and break-down for private parties and banquets; (viii) clean-up after private parties and banquets; and (ix) clean and dust chandeliers and windows.

70. The side work which Plaintiff and other similarly situated employees were required to perform exceeded twenty percent (20%) of their time at work.

71. In addition to their tipped work, Plaintiff and all other similarly situated employees were required by the Defendants to perform work that was unrelated and not incidental to the duties of their tipped occupation.

72. Defendants are not and were not entitled to take the tip credit for all such time. Defendants thus failed to pay Plaintiff and all other similarly situated employees the proper statutory minimum wage rates for this time.

73. As such, Defendants have violated the FLSA, 29 U.S.C. § 206.

74. Additionally, Defendants were blatantly aware of the requirement to pay servers at the full minimum wage rate ($7.25 per hour) for non-tipped work as they did make an exception and pay servers $7.25 per hour when they required servers to come in on their days off for mandatory company meetings. Therefore, Defendants conduct was willful under 29 U.S.C. § 255(a).

75. As a result, Plaintiff and all other similarly situated employees are entitled to at least the applicable minimum wage for all such time worked, without applying a tip credit.

76. Although at this stage Plaintiff and all other similarly situated employees are unable to state the exact amount owed to them, Plaintiff believes that such information will become available during the course of discovery. However, when an employer fails to keep complete and accurate time records, employees may establish the hours worked solely by their testimony and the burden of overcoming such testimony shifts to the employer.

77. Plaintiff and all other similarly situated employees are therefore entitled to recover from Defendants the amount of minimum wages due, prejudgment interest, and the costs and disbursements of this action, including reasonable attorneys' fees.

78. Defendants' violation of the FLSA was willful, knowing, intentional, and reckless. Therefore, Plaintiff on behalf of himself and all other similarly situated employees are entitled to recover liquidated damages from Defendants.

### SECOND CAUSE OF ACTION OF ACTION AS TO PLAINITFF IRVINE
**(Violation of the ADEA; Age Discrimination)**

79. Plaintiff incorporates all allegations above into this cause of action.

80. Defendants are "persons" within the meaning of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 630(b).

81. Defendants are in an industry that affects commerce and Defendants employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in

the current or preceding calendar years. Accordingly, Defendants are employers as defined by the ADEA, 29 U.S.C. § 630(b).

82. Irvine is currently sixty-two (62) years old and, at all times relevant to the facts alleged herein, was over forty (40) years of age.

83. At the time of Irvine's termination and at all times prior thereto, he was performing his job with Defendants in a manner that met Defendants' reasonable and legitimate expectations.

84. Despite the above, Defendants disciplined and forced Irvine to resign without warning, notice, or cause and for false reasons, all on account of Irvine's age.

85. Defendants replaced Irvine with a substantially younger employee who was less than half of Irvine's age.

86. As such, Defendants have violated the ADEA.

87. As a result of the actions of the Defendants, Irvine has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, and further seeks damages in the form of attorneys' fees and costs and prejudgment interest.

88. Defendants' actions were undertaken intentionally, willfully, wantonly, knowingly, and with reckless indifference to Irvine's federally protected rights and, therefore, Irvine is entitled to recover liquidated damages from the Defendants.

### THIRD CAUSE OF ACTION OF ACTION AS TO PLAINITFF IRVINE
**(Constructive Discharge)**

89. Plaintiff incorporates all allegations above into this cause of action.

90. The actions of Defendants' officers, agents, and employees as set forth herein were deliberate and were intended by Defendants and their agents as an effort to force Plaintiff Irvine to quit or resign from his position.

91. Plaintiff Irvine's resignation was a reasonably foreseeable consequence of Defendants' calculated effort to pressure and/or force him into resignation through the imposition of hostile and unreasonably harsh conditions.

92. As a direct result of Defendants' willful and malicious actions, Irvine has suffered damages in the form of lost back and future wages, income and benefits, severe emotional distress and mental anxiety, expenses associated with finding other work, and prejudgment interest.

WHEREFORE, Plaintiff, and all other similarly situated employees and former employees, pray for judgment against Defendants as follows:

(A) Designation of this action as a collective action on behalf of the Class, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b), apprising them of the pendency of this action, and permitting them to assert timely FLSA claims in this action by filing individual Consents pursuant to 29 U.S.C. § 216(b).

(B) As to the First Cause of Action, Plaintiff, and all other similarly situated employees and former employees, pray for such an amount of actual damages as the trier of fact may find (including, but not limited to, all wages, minimum wages, overtime wages, and unpaid wages due) liquidated damages, reasonable attorneys' fees and costs, prejudgment interest, and for such other relief as the court deems just and proper; and

(C) As to the Second and Third Causes of Action, Plaintiff Irvine prays for such an amount of actual and special damages as the trier of fact may find (including damages for lost back and future wages, income and benefits, expenses associated with finding other work, and economic injuries), liquidated damages, prejudgment interest, the costs and disbursements of this

action, including reasonable attorneys' fees, and for such other and further relief as the court deems just and proper.

                                        FALLS LEGAL, LLC

                                        By:s/ J. Scott Falls
                                        Federal ID No.: 10300
                                        scott@falls-legal.com
                                        245 Seven Farms Dr., Suite 250
                                        Charleston, SC 29492
                                        (843) 737-6040 (telephone)
                                        (843) 737-6140 (facsimile)

                                        **Attorney for Plaintiff John P. Irvine, on behalf of himself and all others similarly situated**

Charleston, South Carolina

February 27, 2015

**EXHIBIT A**

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | John P. Irvine<br>338 6th Avenue<br>Mount Pleasant, SC 29464 | From: | Savannah Local Office<br>7391 Hodgson Memorial Drive<br>Suite 200<br>Savannah, GA 31406 |
|---|---|---|---|

[ ] On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 415-2013-00902 | Janice D. Smith, Investigator | (912) 920-4482 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Holly H. Aguilar,
Director

DEC 0 3 2014
(Date Mailed)

Enclosures(s)

cc:
Keith D. Schnulle
Human Resources Director
4601 Palm Blvd
Isle Of Palms, SC 29451

Connie Oliver
BURDZINSKI & PARTNERS INCORPORATED
11 Fairway Dunes Lane
Isle Of Palms, SC 29451